WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR 11-2265-PHX-JAT-002 |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| Maximiliano Rivera-Landeros, et al., | |
| Defendants. | |

Pending before the Court is Defendant Rivera-Landero's Motion to Suppress Statements (Doc. 134). The Court held an evidentiary hearing on the Motion to Suppress on October 31, 2012 at 1:00 p.m. and November 5, 2012 at 9:00 a.m. The Court now rules on the Motion.

Defendant argues that certain statements given to agents of the Drug Enforcement Agency ("DEA") should be suppressed because the statements were obtained as a result of violations of his rights under the Fourth, Fifth, and Sixth Amendments.

**I.   WHETHER THERE WAS A VIOLATION OF DEFENDANT'S FOURTH AMENDMENT RIGHTS**

**A.   Facts**

In March 2011, Special Agents and Task Force Officers of the DEA began an investigation into a Jamaican Drug Trafficking Organization ("DTO"). The DTO was suspected of packaging bulk marijuana and then either distributing or shipping the packages to others for further distribution. During the course of the investigation, DEA

agents suspected that four locations were being used by the DTO: (1) 2329 S. 93rd Avenue, Tolleson, Arizona, the residence of Bianca McKinney (the "Tolleson House"); (2) 17212 N. Scottsdale Road, #2072, Scottsdale, Arizona, at the Pillar at Scottsdale Apartment Complex (the "Scottsdale Apartment"); (3) 6610 North 93rd Avenue, #3096, Glendale, Arizona, at the Pillar at Westgate Apartment Complex (the "Glendale Apartment"); and (4) 1601 E. Highland, #1180, Phoenix, Arizona (the "Highland Apartment").

Specifically, Detective Kurt Kinsey testified as follows:

During a separate investigation involving Kurt Davis ("Davis") not at issue here, investigators placed a pole camera on the Tolleson House. Investigators suspected that Davis was visiting the Tolleson House in rental vehicles for the purpose of obtaining marijuana and shipping it to the East Coast. During that investigation, Detective Kinsey and Officer Anthony Morse put a Global Positioning Satellite ("GPS") device on a green Chevrolet Avalanche that they suspected was being used to ship the marijuana. Through the GPS on the Avalanche, investigators were led to the Scottsdale Apartment.

During surveillance of the Scottsdale Apartment, investigators observed several black males coming in and out of the apartment and meeting there. They also observed several rental vehicles visiting the apartment and saw people bring packing peanuts and flat boxes into the garage of the Scottsdale Apartment. Investigators learned that Bianca McKinney, whose known residence was the Tolleson House, was on the lease of the Scottsdale Apartment.

In April 2011, investigators observed two Hispanic males enter the Scottsdale Apartment carrying a blue shopping bag and exit the apartment carrying the same bag, which appeared to have considerable weight added to it. After the two men left the apartment, investigators conducted a traffic stop on them and found approximately $296,000 in the bag in addition to some marijuana shavings. Thereafter, on April 26, 2011, investigators observed a black Taurus leave the garage of the Scottsdale Apartment

and drive to the post office where the driver dropped two boxes off. A warrant was issued and U.S. Postal Inspector Jeff Agster located marijuana inside the boxes.

On August 18, 2011, investigators observed two black males moving furniture from the Scottsdale Apartment into a U-Haul truck. Bianca McKinney and another female arrived in a white Honda Civic and appeared to be assisting in the moving process. Investigators then followed the U-Haul truck to the Glendale Apartment. Investigators learned that Bianca McKinney was on the lease at the Glendale Apartment. Investigators placed a pole camera on the Jobing.com Arena, which pointed toward the Glendale Apartment. Through pole camera surveillance, investigators saw a pattern of rental cars driving to the Glendale Apartment and saw packing supplies brought into the apartment. Investigators thought that this was a similar pattern to that which they witnessed at the Tolleson House.

On November 9, 2011, Detective Kinsey placed a GPS device on the bottom of a silver Buick. Detective Kinsey and Officer Nelson, partially using the GPS, then followed the Buick to the Highland Apartment. Detective Kinsey and Officer Nelson followed the vehicle from the Highland Apartment to the post office where they observed an individual later identified as co-defendant Brooks mailing a parcel containing 4.5 kilograms of marijuana.

Officer Morse testified as follows:

On November 17, 2011, he was watching pole camera surveillance of the Glendale Apartment when he noticed what he considered to be suspicious activity. Specifically, Officer Morse observed a blue Chevrolet rental car and a silver Buick rental car[1] driving into the garage of the Glendale Apartment and the garage door shutting. Based on this surveillance, Officer Morse and other detectives started en route to the Glendale

---

[1] Officer Morse testified that, in his experience with this investigation, whenever rental cars that had not been seen by investigators in the past were pulled into garages for short periods of time, drug trafficking activities were taking place.

Apartment. About 20 minutes later, before any investigator arrived at the Glendale Apartment, pole camera surveillance observed the two rental cars exit the garage of the Glendale Apartment.

Based on his knowledge of the prior use of the Highland Apartment, Detective DiPiazza thought the cars may be headed toward the Highland Apartment. Accordingly, Officer Morse and other investigators went to the Highland Apartment rather than the Glendale Apartment. Detective Chris DiPiazza was the first to arrive at the Highland Apartment and Officer Morse was the second to arrive. Shortly after Officer Morse arrived, other investigators arrived on scene. The Highland Apartment complex is gated, but, during the day, the gate is left open. Just outside the gate, there is a front office with some parking. When Officer Morse arrived, he drove around the parking lot of the complex and observed a silver Buick that he thought was the same Buick that left the Glendale Apartment earlier that day.

While Officer Morse was sitting in his parked vehicle, he observed a subject exit the Highland Apartment, walk around the parking lot and return to the apartment to open the garage door. Officer Morse suspected that the subject was conducting counter surveillance. Thereafter, Officer Morse observed a white truck occupied by three individuals enter the complex and pull into the garage of the Highland Apartment. The garage was immediately shut when the truck pulled in.

Co-defendant Johnson then exited the Highland Apartment and drove a white Chrysler from visitor parking to a place near the garage of the Highland Apartment. Thereafter, an individual, later identified as co-defendant Williams, exited the Highland Apartment carrying a black suitcase. Co-defendant Williams placed the black suitcase in the trunk of the Chrysler and went back into the Highland Apartment. Based on his experience, the fact that two known marijuana traffickers were using the residence, and the fact that subjects had been seen mailing marijuana after leaving the Highland Apartment, Morse believed that there was money or marijuana inside the suitcase.

Officer Morse then instructed a unit outside of the complex to conduct a traffic stop on co-Defendant Johnson. Johnson's vehicle was then stopped just outside the gated portion of the apartment.

As Ms. Johnson's vehicle was being stopped, the white Ford truck began to exit the garage of the Highland Apartment. Officer Morse then pulled his vehicle around with his lights and sirens on. He yelled to the three occupants of the white Ford truck to put their hands up, but they would not comply. Officer Rhonda Aquipel was approaching the truck and Officer Morse drew his weapon and also began approaching the truck because the occupants would not comply with his commands. Officer Morse then ordered the occupants out of the vehicle and, as he approached, smelled marijuana and saw money scattered over the cab of the truck (later determined to be approximately $13,000). All three occupants of the white truck were then handcuffed.

Officer Morse noticed people inside the Highland Apartment, which was on the second floor, looking through the blinds. Officer Morse was concerned because the evidence suggested that a drug transaction had taken place and persons inside the apartment could have weapons.

At the same time, Detective DiPiazza and Officer Chris Crescione were conducting a traffic stop of co-Defendant Johnson's vehicle on the other side of the apartment building.[2] Officer Morse could not see that traffic stop.

Officer DiPiazza testified that, as the Chrysler driven by Johnson was leaving the complex, he blocked the exit and made verbal contact with the driver. Officer DiPiazza testified that, as he was speaking with Johnson, Officer Crescione was covering him. Officer Crescione testified that, while he was assisting Detective DiPiazza with the traffic stop, he saw someone, later identified as co-defendant Williams, standing in the window

---

[2] Officer Morse testified that, after obtaining consent to search the Chrysler from Johnson, a bale of marijuana was found in the black suitcase that Williams had placed inside the truck.

- 5 -

of the Highland Apartment. Detective DiPiazza testified that Williams kicked out the screen of the window. Officer Crescione testified that he ordered the person to go back inside and, when the person failed to obey his commands, he drew his weapon and ordered the person back inside the house. Officer Crescione testified that he never ordered anyone out of the apartment, but thought that the officers and detectives on the other side of the apartment may have ordered people to come out of the apartment. Detective DiPiazza testified that he was extremely concerned that co-defendant Williams was going to jump from the window, as Detective DiPiazza had witnessed a suspect attempt a similar jump and break his leg about two weeks prior to this incident.

Officer Morse testified that, as he was detaining the white truck, the front door of the apartment opened and people began exiting the apartment. The first person to exit, co-defendant White, had a handgun in his waistband and four other men followed him out of the apartment with their hands up. Officer Morse testified that there were only three officers in the front of the apartment and he was concerned about the safety of the officers, especially because they were outnumbered.

Specifically, Officer Morse testified that the ideal ratio for officer safety is one officer for each suspect. Officer Morse testified that, when the five men exited the apartment, the investigators were dealing with eight suspects, including the men in the white truck, and there were only three investigators on scene at that time. Officer Morse testified that he was also concerned that there were additional people still inside the apartment and there were not enough investigators to control all of the potential threats. Officer Morse testified that, based on this concern, he and the other officers secured the weapon and handcuffed the five individuals that exited the apartment and the three individuals in the white truck. Defendant was one of the individuals that exited the apartment and was then handcuffed.

Officer Morse testified that, when the five men exited the apartment, they left the front door open behind them and he then approached the door to see if he could see any

other occupants inside. Officer Morse testified that he then smelled marijuana emanating from inside the apartment and heard water running inside.[3] Officer Morse testified that it was then decided that the investigators would do a protective sweep of the apartment to ensure that there was no one else inside that would pose a threat to the officers' safety and to make sure that evidence was not being destroyed. Officer Morse testified that, during the protective sweep, investigators observed numerous bales of marijuana and drug packaging supplies in plain view and the apartment appeared to be used solely for the packaging of marijuana. Officer Morse testified that the apartment appeared to be used solely for packaging drugs and, based on his experience, a drug trafficker would not allow anyone to enter the apartment who was not also involved in the drug trafficking activity. The following day, a search warrant for the apartment was obtained and a full search was executed. All persons detained at the Highland Apartment, including Defendant, were arrested and transported to the Scottsdale Police Department holding facility.

Defendant argues that his rights under the Fourth Amendment were violated when he was detained without reasonable suspicion, and then arrested without a warrant. In response, the Government argues that there was reasonable suspicion and/or probable cause to conduct a *Terry* stop of Defendant when he exited the Highland Apartment and, after the protective sweep, the officers had probable cause that defendant was involved with marijuana possession and/or trafficking to lawfully detain and arrest him.

### B. Legal Standard

Generally, probable cause is required for a warrantless arrest. *Michigan v. Summers*, 452 U.S. 692, 700 (1981).

> Probable cause to arrest exists when officers have knowledge
> or reasonably trustworthy information sufficient to lead a

---

[3] Officer Morse testified that it was his understanding that a sink was running in the kitchen directly upstairs from the front door.

> person of reasonable caution to believe that an offense has been or is being committed by the person being arrested . . . Alternatively, this court has defined probable cause as follows: when under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime.

*United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (internal citations and quotations omitted; brackets in original).

In general, "[a] Terry stop involves no more than a brief stop, interrogation and, under proper circumstances, a brief check for weapons." *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001) (quoting *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir. 1987). A *Terry* stop is permissible under the Fourth Amendment, "if the officer's action is supported by reasonable suspicion to believe criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations omitted).

> [I]n determining whether an officer had reasonable suspicion, due weight must be given, not to his inchoate and unparticularized suspicion, or hunch, but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience[]. Reasonable suspicion is less than probable cause; it is merely a particularized and objective basis for suspecting the person stopped of criminal activity.

*United States v. Crasper*, 472 F.3d 1141, 1147 (9th Cir. 2007) (internal citations and quotations omitted). The Court should consider the totality of the circumstances in deciding whether the officers had a particularized and objective basis for suspecting wrongdoing. *United States v. Terry-Crespo*, 356 F.3d 1170, 1173-74 (9th Cir. 2004).

### C. Analysis

The Government argues that it had a particularized and objective basis for suspecting Defendant was involved in criminal activity when it detained him after he exited the Highland Apartment. The Court agrees. Prior to the surveillance on

November 17, 2011, investigators knew that individuals visiting the Highland Apartment were involved in the possession and distribution of marijuana. On November 17, 2011, investigators observed various individuals entering and exiting the Highland Apartment.

Upon stopping the white Ford truck that was parked in the garage of the Highland Apartment, investigators smelled marijuana and observed a large quantity of cash. When the occupants of the Highland Apartment observed the white Ford Truck and the Chrysler being stopped by Crescione and DiPiazza, co-defendant Williams kicked out the window screen and stood in the window as if he were going to jump. Officer Crescione testified that he ordered Williams back into the Highland Apartment and all five men exited the apartment. Defendant did not testify the reason he exited the apartment. Co-defendant Brooks testified that, while he was inside the apartment, he heard investigators outside yelling "come out with your hands up." Co-defendant Brooks is the only person who testified that investigators ordered the five men out of the apartment. Officers Morse and Crescione, and Detective DiPiazza all testified that there were several commands happening at once and each testified that they did not make or specifically hear anyone make such a command to the people inside the apartment. Based on this testimony, the Court finds that the five men exited the apartment voluntarily either because, when Williams was ordered out of the window, they thought they should exit through the front door or because they thought commands being made to suspects in the white truck were directed at them.

Task Force Officer Morse testified that, as the men exited the apartment, he noticed that one of them was carrying a weapon in his waistband and he smelled a strong odor of marijuana in the apartment. Under these circumstances, it was reasonable for investigators to conduct a *Terry* stop of Defendant, as, based on the totality of the circumstances, it was reasonable to suspect that Defendant was involved in criminal activity relating to drugs.

Further, in conducting a protective sweep of the apartment, investigators noted

that the apartment contained numerous bales of marijuana and drug packaging supplies. Accordingly, the Court finds that there was probable cause to arrest Defendant after the protective sweep because investigators had reason to conclude that there was a fair probability that Defendant was involved with the activities of the drug trafficking organization.

Based on the foregoing, investigators had reasonable suspicion to conduct a *Terry* stop of Defendant and probable cause to arrest him. Thus, Defendant's Fourth Amendment rights were not violated and his motion to suppress statements as a result of such an alleged violation is denied.

## II. WHETHER DEFENDANT'S FIFTH AND SIXTH AMENDMENT RIGHTS WERE VIOLATED

Defendant next argues that his Fifth and Sixth Amendment rights were violated because (1) investigators violated Defendant's Fifth Amendment and Sixth Amendment right to counsel when they continued to question him after he asked for an attorney; (2) investigators violated Defendant's Fifth Amendment right to not incriminate himself when they continued to question him after he requested an attorney; and (3) Defendant's incriminatory statements were involuntary because investigators coerced Defendant into giving such statements.

### A. Facts

After his arrest at the Highland Apartment, Defendant was initially interviewed by DEA Special Agent Strabala, with Scottsdale Police Department Detectives Mendoza and Penttinen witnessing the interview. Agent Strabala testified that she asked Defendant if he was comfortable speaking in English and Defendant said he was comfortable speaking in English. Agent Strabala testified that Defendant did not appear to have difficulty speaking in English and Agent Strabala never felt that he might need an interpreter during the interview. Agent Strabala testified that, after obtaining personal information, Defendant was read his *Miranda* rights in English and he said he understood them. The events that occurred during Defendant's interviews after his arrest are largely

in dispute.

Agent Strabala testified that Defendant told her that the three men that were detained in the Ford truck were his friends. Agent Strabala testified that Defendant told her that he rode over to the apartment with his friends in the white truck that "Geno" was driving. Agent Strabala testified that Defendant maintained that he did not know what they were doing at the apartment and that he never went inside the apartment. Agent Strabala testified that Defendant never invoked his right to counsel or his right to remain silent and that Defendant was never threatened or coerced during the course of the interview.

Defendant testified that the interview with Agent Strabala ended when Defendant asked her if it was mandatory to continue answering her questions and told her he wanted to speak to an attorney. Defendant testified that he never told Agent Strabala that he knew any of the men in the white Ford truck and that he never told her that he did not go into the apartment. Rather, Defendant testified that he only knew "K," later determined to be co-defendant Williams. Defendant testified that he knew K between one to three months and that he had spent the night at the Glendale apartment before. Defendant testified that he went straight to the second floor of the Highland Apartment and sat on the couch and never went into any other area of the apartment. Defendant testified that, while he was in the Highland Apartment, he did not see or smell the 150 pounds of marijuana being packaged inside and had no idea that there were drug trafficking activities taking place.

The facts relating to Defendant's second interview are likewise in dispute:

Detective Morse testified that, before Defendant's second interview, other co-defendants were interviewed by Task Force Officer Morse and Detective DiPiazza. Detective DiPiazza testified that, during an interview with co-Defendant Williams, co-Defendant Williams testified to ongoing relationship with Defendant. Officer Morse testified that he and DiPiazza began a second interview with Defendant, wherein they

confirmed that Strabala had previously informed Defendant of his *Miranda* rights. Officer Morse testified that Defendant then made several incriminating statements and admitted to marijuana trafficking and distribution. Detective Morse and Detective DiPiazza testified that Defendant never invoked his right to remain silent or his right to counsel and that Defendant was never coerced or threatened.

Defendant testified that, when Officer Morse and Detective DiPiazza came to get him for the second interview, he told one of them, though he does not remember which one, that he had already requested to speak to a lawyer. Defendant testified that the response was "I already knew that, but this is just between you and us."

Defendant testified that Officer Morse and Detective DiPiazza said that if he helped them, they would speak to the court and he would only spend a few months in jail and he would be released. Defendant testified that at some point he became scared because "one of them" said he would write anything in the police report the he wished." Defendant testified that he then asked if they could make him any assurances and they told him they could not. Defendant testified that he only told Morse and DiPiazza that he had a person's phone number in his phone and that, in response, they told him that they would return at 11 the next morning to see if he had changed his mind about helping them. Defendant testified that Morse and DiPiazza "did threaten" him, but that he did not make any incriminating statements.

In his Motion, Defendant claims that Morse and DiPiazza threatened him with 15 years in prison if he did not confess and that, as result of this "threat," he made some incriminatory statements. This argument in the motion to suppress is inconsistent with Defendant's testimony, wherein he denied making inculpatory statements and never testified that Morse and DiPiazza threatened him with 15 years in prison.

Defendant argues that his Fifth Amendment and Sixth Amendment[4] right to

---

[4] The *Miranda* right to counsel attaches only in the context of custodial interrogation and there is no question that Defendant was the subject of custodial

- 12 -

counsel were violated when investigators questioned him a second time after he invoked his right to an attorney. Defendant also argues that his Fifth Amendment right not to incriminate himself was violated because, when he asked for an attorney, he implicitly invoked his right to remain silent and investigators nonetheless coerced him into making incriminatory statements. In response, the Government argues that Defendant at no time invoked his right to an attorney or to remain silent and Defendant was not coerced into giving incriminatory statements.

### B. *Miranda* and Voluntariness

#### 1. *Miranda* Legal Standard

In *Miranda v. Arizona,* the Supreme Court held that, in order to protect a defendant's rights against compelled self-incrimination under the Fifth Amendment, before police initiate custodial interrogation, they must, in addition to other rights, advise a defendant that he has a right to counsel and a right to remain silent. 384 U.S. 436, 467-72 (1966). "The right to counsel established in *Miranda* was one of a 'series of recommended 'procedural safeguards'. . . [that] were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected.'" *Davis v. United States,* 512 U.S. 452, 457 (1994). Additionally, pursuant to *Edwards v. United States,* 451 U.S. 477 (1981), and its progeny, once a defendant invokes his right to counsel under *Miranda,* the defendant must reinitiate contact in order for the authorities to resume interrogation.

---

interrogation during the two interviews at issue in this case. However, Defendant has made no argument that he was formally arraigned or that other judicial proceedings had been initiated against him such that his right to counsel under the Sixth Amendment had attached at the time of the two interviews. *See Davis v. U.S.*, 512 U.S. 452, 456-57 (1994); *U.S. v. Gouveia*, 467 U.S. 180, 188 (1984). Even if Defendant's Sixth Amendment right to counsel had attached at the time of the two interviews, the Court's conclusion that Defendant's right to counsel was not violated during those interviews would not change.

- 13 -

#### a. Analysis

In this case, Defendant acknowledges that he was read his *Miranda* rights and that he waived them at first. However, Defendant argues that, at some point, he invoked his right to counsel and thus, all questioning should have ceased until counsel was provided. However, Officer Strabala, Officer Morse and Detective DiPiazza dispute Defendant's version of events. Officer Strabala, Officer Morse and Detective DiPiazza testified that Defendant never invoked his right to counsel and that his waiver of his *Miranda* rights was knowing and voluntary. The Court finds the testimony of Officer Strabala, Officer Morse and Detective DiPiazza to be credible. Defendant's testimony to the contrary is self-serving and not credible.

Accordingly, the Court finds that Defendant was read his *Miranda* rights and, having never invoked his right to counsel, any such rights guaranteed by the Fifth Amendment were not violated.

### 2. Voluntariness

Defendant argues that his waiver of his *Miranda* rights was not voluntary because before the second interview, he told an investigator that he previously told other officers he wanted a lawyer present before any additional questioning occurred and they responded that they were aware of it but "this was just between you and us."

In his Motion, Defendant further argues that, during the second interview, Officer Morse and Detective DiPiazza improperly coerced him, into making incriminating statements with the threat that, if he did not cooperate with them right now and tell them everything he knew, he would serve fifteen years or more in prison and they would include in their report "whatever they wanted to put down on paper." However, this argument in the Motion is not consistent with Defendant's testimony of the events of the second interview. Although Defendant testified that he was threatened, he also testified that he never made incriminating statements and he did not testify that he was threatened with 15 years in prison. Defendant also testified that he asked Morse and DiPiazza what

they could assure him of and they said they could assure him of nothing. Thus, it appears that Defendant was attempting to negotiate and was not feeling that his will was overcome. Nonetheless, the Court will briefly address Defendant's arguments below.

Officer Morse and Detective DiPiazza testified that they never threatened Defendant and Defendant never invoked his right to counsel and, at all times, Defendant's rights were honored.

### a. Legal Standard and Analysis

Even after a *Miranda* waiver, the Government must establish the voluntariness of a confession by a preponderance of the evidence. *United States v. Kelley*, 953 F.2d 562, 564 (9th Cir. 1992) (overruled on other grounds by *United States v. Kim*, 105 F.3d 1579, 1581 (9th Cir. 1997)). A "confession is involuntary only if the police use coercive means to undermine the suspect's ability to exercise his free will." *Pollard v. Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002), *cert. denied* 537 U.S. 981 (2002); *Henry v. Kernan*, 197 F.3d 1021, 1026 (9th Cir. 1999). Impermissible coercive activity can include lengthy questioning, deprivation of food or sleep, physical threats of harm, and psychological persuasion. *Kelley*, 953 F.2d at 565. When a suspect alleges psychological coercion, the relevant question is whether the suspect's will was overborne when he confessed. *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993).

"A court . . . is required to determine, in light of the totality of the circumstances, whether a confession was made freely, voluntarily and without compulsion or inducement of any sort." *Ortiz v. Uribe*, 671 F.3d 863, 869 (9th Cir. 2011) (internal citation and quotation marks omitted). A defendant's "personal characteristics . . . are constitutionally irrelevant absent proof of coercion." *Derrick v. Peterson*, 924 F.2d 813, 818 (9th Cir. 1990) (internal citation and quotation omitted). Further,

> giving the [*Miranda*] warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires

> unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver. *See Berkemer v. McCarty*, 468 U.S. 420, 433, n. 20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare").

*Missouri v. Seibert*, 542 U.S. 600, 608-609 (2004).

As discussed above, the Court finds the testimony of Officer Morse and Detective DiPiazza that Defendant waived his *Miranda* rights and never invoked his right to counsel credible. Likewise, the Court finds the testimony of Officer Morse and Detective DiPiazza that they did not threaten Defendant or suggest that they would just write down "whatever they wanted to put on paper" about Defendant to be credible. Accordingly, the Court finds that Defendant's waiver of his *Miranda* rights was knowing and voluntary and Defendant was not coerced into confessing.

Based on the foregoing, Defendant's Fifth and Sixth Amendment rights were not violated and his motion to suppress based on such violations is denied.

### III. CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Defendant Rivera-Landero's Motion to Suppress Statements (Doc. 134) is denied.

Dated this 28th day of November, 2012.

James A. Teilborg
United States District Judge