WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR 11-2265-PHX-JAT-003 |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| Rafiq Brooks, et al., | |
| Defendants. | |

Pending before the Court is Defendant Rafiq Brooks' (1) Motion to Suppress Statements (*Miranda* and Voluntariness) (Doc. 99); (2) Motion to Suppress Evidence (Firearm and Ammunition) Based Upon Involuntary Consent to Search (Doc. 105); (3) Motion to Suppress Evidence (No Probable Cause for Arrest or Reasonable Suspicion for Stop) (Doc. 121) and (4) Motion to Sever Defendant (Doc. 129). The Court now rules on the Motions.

## I. FACTUAL BACKGROUND

In March 2011, Special Agents and Task Force Officers of the DEA began an investigation into a Jamaican Drug Trafficking Organization ("DTO"). The DTO was suspected of packaging bulk marijuana and then either distributing or shipping the packages to others for further distribution. During the course of the investigation, DEA agents suspected that four locations were being used by the DTO: (1) 2329 S. 93rd Avenue, Tolleson, Arizona, the residence of Bianca McKinney (the "Tolleson House"); (2) 17212 N. Scottsdale Road, #2072, Scottsdale, Arizona, at the Pillar at Scottsdale Apartment Complex (the "Scottsdale Apartment"); (3) 6610 North 93rd Avenue, #3096,

Glendale, Arizona, at the Pillar at Westgate Apartment Complex (the "Glendale Apartment"); and (4) 1601 E. Highland, #1180, Phoenix, Arizona (the "Highland Apartment").

Specifically, Detective Kurt Kinsey testified as follows:

During a separate investigation involving Kurt Davis ("Davis") not at issue here, investigators placed a pole camera on the Tolleson House. Investigators suspected that Davis was visiting the Tolleson House in rental vehicles for the purpose of obtaining marijuana and shipping it to the East Coast. During that investigation, Detective Kinsey and Officer Anthony Morse put a Global Positioning Satellite ("GPS") device on a green Chevrolet Avalanche that they suspected was being used to ship the marijuana. Through the GPS on the Avalanche, investigators were led to the Scottsdale Apartment.

During surveillance of the Scottsdale Apartment, investigators observed several black males coming in and out of the apartment and meeting there. They also observed several rental vehicles visiting the apartment and saw people bring packing peanuts and flat boxes into the garage of the Scottsdale Apartment. Investigators learned that Bianca McKinney, whose known residence was the Tolleson House, was on the lease of the Scottsdale Apartment.

In April 2011, investigators observed two Hispanic males enter the Scottsdale Apartment carrying a blue shopping bag and exit the apartment carrying the same bag, which appeared to have considerable weight added to it. After the two men left the apartment, investigators conducted a traffic stop on them and found approximately $296,000 in the bag in addition to some marijuana shavings. Thereafter, on April 26, 2011, investigators observed a black Taurus leave the garage of the Scottsdale Apartment and drive to the post office where the driver dropped two boxes off. A warrant was issued and U.S. Postal Inspector Jeff Agster located marijuana inside the boxes.

On August 18, 2011, investigators observed two black males moving furniture from the Scottsdale Apartment into a U-Haul truck. Bianca McKinney and another female arrived in a white Honda Civic and appeared to be assisting in the moving

process. Investigators then followed the U-Haul truck to the Glendale Apartment. Investigators learned that Bianca McKinney was on the lease at the Glendale Apartment. Investigators placed a pole camera on the Jobing.com Arena, which pointed toward the Glendale Apartment. Through pole camera surveillance, investigators saw a pattern of rental cars driving to the Glendale Apartment and saw packing supplies brought into the apartment. Investigators thought that this was a similar pattern to that which they witnessed at the Tolleson House.

On November 9, 2011, Detective Kinsey placed a GPS device on the bottom of a silver Buick. Detective Kinsey and Officer Nelson, partially using the GPS, then followed the Buick to the Highland Apartment. Detective Kinsey and Officer Nelson followed the vehicle from the Highland Apartment to the post office where they observed an individual later identified as Defendant mailing a parcel containing 4.5 kilograms of marijuana. Defendant testified that he did not know there was marijuana in the box that he dropped off at the post office. Defendant testified that someone asked him to ship the box, but that he could not remember who told him to ship the box.

Officer Morse testified as follows:

On November 17, 2011, he was watching pole camera surveillance of the Glendale Apartment when he noticed what he considered to be suspicious activity. Specifically, Officer Morse observed a blue Chevrolet rental car and a silver Buick rental car[1] driving into the garage of the Glendale Apartment and the garage door shutting. Based on this surveillance, Officer Morse and other detectives started en route to the Glendale Apartment. About 20 minutes later, before any investigator arrived at the Glendale Apartment, pole camera surveillance observed the two rental cars exit the garage of the Glendale Apartment.

Based on his knowledge of the prior use of the Highland Apartment, Detective

---

[1] Officer Morse testified that, in his experience with this investigation, whenever rental cars that had not been seen by investigators in the past were pulled into garages for short periods of time, drug trafficking activities were taking place.

- 3 -

1  DiPiazza thought the cars may be headed toward the Highland Apartment. Accordingly,
2  Officer Morse and other investigators went to the Highland Apartment rather than the
3  Glendale Apartment. Detective Chris DiPiazza was the first to arrive at the Highland
4  Apartment and Officer Morse was the second to arrive. Shortly after Officer Morse
5  arrived, other investigators arrived on scene. The Highland Apartment complex is gated,
6  but, during the day, the gate is left open. Just outside the gate, there is a front office with
7  some parking. When Officer Morse arrived, he drove around the parking lot of the
8  complex and observed a silver Buick that he thought was the same Buick that left the
9  Glendale Apartment earlier that day.

10  While Officer Morse was sitting in his parked vehicle, he observed a subject exit
11  the Highland Apartment, walk around the parking lot and return to the apartment to open
12  the garage door. Officer Morse suspected that the subject was conducting counter
13  surveillance. Thereafter, Officer Morse observed a white truck occupied by three
14  individuals enter the complex and pull into the garage of the Highland Apartment. The
15  garage was immediately shut when the truck pulled in.

16  Co-defendant Johnson then exited the Highland Apartment and drove a white
17  Chrysler from visitor parking to a place near the garage of the Highland Apartment.
18  Thereafter, an individual, later identified as co-defendant Williams, exited the Highland
19  Apartment carrying a black suitcase. Co-defendant Williams placed the black suitcase in
20  the trunk of the Chrysler and went back into the Highland Apartment. Based on his
21  experience, the fact that two known marijuana traffickers were using the residence, and
22  the fact that subjects had been seen mailing marijuana after leaving the Highland
23  Apartment, Morse believed that there was money or marijuana inside the suitcase.
24  Officer Morse then instructed a unit outside of the complex to conduct a traffic stop on
25  co-Defendant Johnson. Johnson's vehicle was then stopped just outside the gated portion
26  of the apartment.

27  As Ms. Johnson's vehicle was being stopped, the white Ford truck began to exit
28  the garage of the Highland Apartment. Officer Morse then pulled his vehicle around with

his lights and sirens on. He yelled to the three occupants of the white Ford truck to put their hands up, but they would not comply. Officer Rhonda Aquipel was approaching the truck and Officer Morse drew his weapon and also began approaching the truck because the occupants would not comply with his commands. Officer Morse then ordered the occupants out of the vehicle and, as he approached, smelled marijuana and saw money scattered over the cab of the truck (later determined to be approximately $13,000). All three occupants of the white truck were then handcuffed.

Officer Morse noticed people inside the Highland Apartment, which was on the second floor, looking through the blinds. Officer Morse was concerned because the evidence suggested that a drug transaction had taken place and persons inside the apartment could have weapons.

At the same time, Detective DiPiazza and Officer Chris Crescione were conducting a traffic stop of co-Defendant Johnson's vehicle on the other side of the apartment building.[2] Officer Morse could not see that traffic stop.

Officer DiPiazza testified that, as the Chrysler driven by Johnson was leaving the complex, he blocked the exit and made verbal contact with the driver. Officer DiPiazza testified that, as he was speaking with Johnson, Officer Crescione was covering him. Officer Crescione testified that, while he was assisting Detective DiPiazza with the traffic stop, he saw someone, later identified as co-defendant Williams, standing in the window of the Highland Apartment. Detective DiPiazza testified that Williams kicked out the screen of the window. Officer Crescione testified that he ordered the person to go back inside and, when the person failed to obey his commands, he drew his weapon and ordered the person back inside the house. Officer Crescione testified that he never ordered anyone out of the apartment, but thought that the officers and detectives on the other side of the apartment may have ordered people to come out of the apartment.

---

[2] Officer Morse testified that, after obtaining consent to search the Chrysler from Johnson, a bale of marijuana was found in the black suitcase that Williams had placed inside the truck.

- 5 -

Detective DiPiazza testified that he was extremely concerned that co-defendant Williams was going to jump from the window, as Detective DiPiazza had witnessed a suspect attempt a similar jump and break his leg about two weeks prior to this incident.

Officer Morse testified that, as he was detaining the white truck, the front door of the apartment opened and people began exiting the apartment. The first person to exit, co-defendant White, had a handgun in his waistband and four other men followed him out of the apartment with their hands up. Morse testified that there were only three officers in the front of the apartment and he was concerned about the safety of the officers, especially because they were outnumbered.

Specifically, Officer Morse testified that the ideal ratio for officer safety is one officer for each suspect. Officer Morse testified that, when the five men exited the apartment, the investigators were dealing with eight suspects, including the men in the white truck, and there were only three investigators on scene at that time. Officer Morse testified that he was also concerned that there were additional people still inside the apartment and there were not enough investigators to control all of the potential threats. Officer Morse testified that, based on this concern, he and the other officers secured the weapon and handcuffed the five individuals that exited the apartment and the three individuals in the white truck. Defendant was one of the individuals that exited the apartment and was then handcuffed.

Officer Morse testified that, when the five men exited the apartment, they left the front door open behind them and he then approached the door to see if he could see any other occupants inside. Officer Morse testified that he then smelled marijuana emanating from inside the apartment and heard water running inside.[3] Officer Morse testified that it was then decided that the investigators would do a protective sweep of the apartment to ensure that there was no one else inside that would pose a threat to the officers' safety

---

[3] Officer Morse testified that it was his understanding that a sink was running in the kitchen directly upstairs from the front door.

and to make sure that evidence was not being destroyed. Officer Morse testified that, during the protective sweep, investigators observed numerous bales of marijuana and drug packaging supplies in plain view and the apartment appeared to be used solely for the packaging of marijuana. Officer Morse testified that the apartment appeared to be used solely for packaging drugs and, based on his experience, a drug trafficker would not allow anyone to enter the apartment who was not also involved in the drug trafficking activity. The following day, a search warrant for the apartment was obtained and a full search was executed. Defendant testified that he never smelled or saw marijuana in the Highland Apartment.

Officer Morse testified that, after Defendant was handcuffed, Officer Morse read Defendant his *Miranda* rights from a Scottsdale Police Department issued *Miranda* card. Officer Morse testified that Defendant told him that he understood his rights. Officer Morse testified that Defendant had a key for a Buick in his possession and Officer Morse then asked Defendant if the silver Buick belonged to him and Defendant replied that it did. Officer Morse testified that he asked Defendant if Defendant rented the silver Buick and Defendant responded affirmatively. Officer Morse testified that he asked Defendant if there was anyone else on the rental contract and Defendant responded that a woman was also on the rental contract.[4] Officer Morse testified that he asked Defendant if he could search the vehicle and Defendant responded that he could search the vehicle. Officer Morse testified that, when he asked Defendant whether he could search the vehicle, Defendant was sitting on the curb, there were no weapons drawn, Defendant's demeanor was normal, and Officer Morse believed Defendant's responses were voluntary.

Defendant testified that, on November 17, he was in the Highland Apartment taking a nap on the couch when he heard people in the apartment with him running

---

[4] During his testimony, Officer Morse could not remember if Defendant said it was his girlfriend or wife that was also on the rental contract for the silver Buick.

- 7 -

around and someone outside saying "come out with your hands up." Defendant testified that, while he was handcuffed, Officer Morse found the keys to the Buick in his pocket and immediately asked Defendant if the Buick belonged to him, to which Defendant responded yes. Defendant testified that Morse then asked Defendant if he could search the Buick and Defendant said yes. Defendant testified that another officer then took the remaining items in his pockets.

Defendant testified that Officer Morse did not read Defendant his *Miranda* rights until after he had obtained consent to search the car. Defendant testified that, when Officer Morse asked whether he could search the vehicle, Defendant told him "go ahead" "because I knew there was nothing in the car." Defendant testified that he told Officer Morse that his girlfriend was also on the rental contract for the car. Defendant testified that he was not sure if he would have given consent if everything had not happened so fast.

All persons detained at the Highland Apartment, including Defendant, were arrested and transported to the Scottsdale Police Department holding facility.

DEA Special Agent Cecilia Strabala testified that, after his arrest at the Highland Apartment, Defendant was initially interviewed by Agent Strabala, with Scottsdale Police Department Detectives Mendoza and Penttinen witnessing the interview. Agent Strabala testified that she again read Defendant his *Miranda* rights and Defendant acknowledged his rights. Agent Strabala testified that, during the interview, Defendant confirmed he was at the Highland Apartment, but indicated he only knew one "homie" at that apartment. Agent Strabala testified that, when she asked Defendant who his homie was, he gave no response. Agent Strabala testified that Defendant then indicated he did not want to talk anymore or answer any other questions regarding anything that happened.

Officer Strabala testified that she then stopped the interview. Officer Strabala testified that, during this interview with Defendant, Defendant sat with his body pointed away from her and refused to make eye contact with her. Officer Strabala testified that it was not clear to her whether Defendant did not want to speak to any investigator or

1  whether he just did not want to speak to her personally. Officer Strabala testified that, as soon as Defendant told her he did not want to talk to her, she immediately ceased asking Defendant questions. Defendant testified that he told Officer Strabala that he did not want to answer more questions and she stopped answering questions.

Officer Morse testified that, at approximately 3:00 a.m., Officer Morse and Detective DiPiazza contacted Defendant in the jail interview room after interviewing other suspects arrested on scene. Officer Morse testified that he confirmed with Defendant that he had previously been advised of his rights by Agent Strabala. Officer Morse testified that he was not aware that Defendant had previously invoked his right to remain silent to Agent Strabala. Officer Morse and Detective DiPiazza testified that Defendant did not provide any inculpatory statements and denied involvement in any drug trafficking. Officer Morse and Detective DiPiazza testified that the interview was then terminated when Defendant told Morse and DiPiazza that he did not want to talk to them.

Defendant testified that Officer Morse did confirm that Defendant had previously been read his rights. In his motion, Defendant claims that, during this interview, Morse and DiPiazza threatened Defendant with longer interrogation if he did not cooperate and, when Defendant asked to call family members, he was told he would be allowed to do so only if he answered their questions. Officer Morse and Detective DiPiazza testified that they never threatened Defendant and did not condition calling family members upon his answering questions.

**II.     Motion to Suppress Statements (*Miranda* and Voluntariness) (Doc. 99)**

First, Defendant argues that his rights were violated when he was questioned at the Highland Complex without being advised of his *Miranda* rights. As a result, Defendant seeks to suppress the statement that he made to Officer Morse that he had rented the silver Buick.[5]

---

[5] Although, in his motion, Defendant denies that he made any statements to

Second, Defendant argues that the statements he made to Morse and DiPiazza[6] at the interview that occurred around 3:00 a.m. should be suppressed because that interview was a violation of Defendant's right to remain silent, which Defendant argues he clearly invoked at the conclusion of the previous interview with Agent Strabala.

Finally, Defendant argues that his statements made to Officer Morse at the Highland Complex and his statements to Morse and DiPiazza at the 3:00 a.m. interview should be suppressed because they were involuntary.

The Court will address each of Defendant's arguments in turn.

### A. Whether Statements Made at the Highland Complex Should be Suppressed based on a *Miranda* Violation

Defendant seeks to suppress the statements he made to Officer Morse at the Highland Complex because he was not first advised of his *Miranda* rights before being questioned by Officer Morse. Officer Morse testified that he read Defendant his *Miranda* rights from a Scottsdale Police Department issued *Miranda* card before asking any questions. The Court finds that Officer Morse's testimony was credible and Defendant's testimony that Officer Morse did not read him his *Miranda* rights until after questioning him was not credible. Accordingly, the Court finds that Defendant was read his *Miranda* rights before being questioned by Officer Morse and, accordingly, no statements made to Officer Morse at the Highland Complex will be suppressed based on a *Miranda* violation.

---

Officer Morse regarding ownership or rental of the Buick, Defendant testified that his girlfriend rented the Buick for him.

[6] Defendant does not specifically identify any statements that should be suppressed from this interview. The Government points out that Defendant made no inculpatory statements during that interview and that Defendant's denial of any knowledge of the firearm in the Buick should not be admitted unless Defendant determines to testify about it. Accordingly, it appears that there are no statements to be suppressed and this issue is moot. However, because Defendant submitted a motion and did not withdraw the motion upon receiving the Government's response, the Court will assume, for the purposes of this Order, that Defendant seeks to suppress any and all statements made during the 3:00 a.m. interview with Morse and DiPiazza.

- 10 -

### B. Whether Statements Made During the 3:00 a.m. Interview Should Be Suppressed based on a Violation of Defendant's Right to Remain Silent

Defendant argues that the statements he made to Morse and DiPiazza at the interview that occurred around 3:00 a.m. at the Police Department should be suppressed because that interview was a violation of Defendant's right to remain silent, which Defendant argues he clearly invoked at the conclusion of the previous interview with Agent Strabala.

#### 1. Legal Standard

Because individuals have a Fifth Amendment right not to incriminate themselves, once an individual invokes their right to remain silent, such invocation must be "scrupulously honored." *See U.S. v. Hsu*, 852 F.2d 407, 409 (9th Cir. 1988) (citing *Michigan v. Mosely*, 423 U.S. 96, 104 (1975)). To determine if an individual's invocation of the right to remain silent has been scrupulously honored, the Court takes a flexible, case-by-case approach taking account of all the relevant circumstances. *Id.* at 410. Among the factors the Court considers are "the amount of time that elapsed between interrogations, the provision of fresh warnings, the scope of the second interrogation, and the zealousness of officers in pursuing questioning after the suspect has asserted the right to silence." *Id.* at 410. Two of the most important factors are whether fresh *Miranda* warnings were given and whether there was actual coercion by police upon the suspect in order to extract information. *Id.* at 410-411.

#### 2. Analysis

Defendant argues that the factors weigh in favor of finding that his right to remain silent was not scrupulously honored because (1) instead of giving fresh warnings, Morse simply confirmed that Defendant had been previously Mirandized, (2) Morse and DiPiazza threatened Defendant with longer incarceration and would not let him call his family members until he answered their questions and (3) Morse and DiPiazza were dishonest with Defendant in telling him that he previously admitted that he was the only

driver of the silver Buick, which Defendant denies admitting, "in a clear attempt to convince Defendant to change his mind and waive his *Miranda* rights." (Doc. 99 at 14). In Response, the Government argues that Defendant's rights were scrupulously honored.

The second interview occurred eight hours after Defendant had invoked his right to remain silent and was initiated by Morse and DiPiazza, who were unaware that Defendant had invoked his right to remain silent to Strabala, and who had been interviewing other suspects that were arrested at the Highland Complex. At the suppression hearing, Morse and DiPiazza testified that that they did not make any threats to Defendant regarding longer incarceration or refuse to allow him to phone his family members if he did not answer their questions.

The Court finds that, under all of the relevant circumstances, Defendant's right to remain silent was scrupulously honored. Defendant told Strabala that he did not want to answer further questions and Strabala immediately ceased questioning Defendant. Approximately eight hours later, Morse and DiPiazza again attempted to interview Defendant. Although they did not administer fresh *Miranda* warnings, they did confirm with Defendant that he had previously been Mirandized and, in fact, Defendant admits that he had previously that same night been Mirandized twice. The Court finds that Morse and DiPiazza's testimony that they did not threaten Defendant to be credible. Finally, after answering only a few questions, which the Government contends were not inculpatory, Defendant felt free to and did invoke his right to remain silent again. At that time, Morse and DiPiazza immediately stopped their questioning. Accordingly, based on the relevant circumstances, Defendant's right to remain silent was not violated.

    **C. Whether Statements Made at the Highland Complex and During the 3:00 a.m. Interview Should be Suppressed as Involuntary**

Defendant also argues that the statements he made to Task Force Officer Tony Morse and Detective Chris DiPiazza at the Scottsdale Police Department District Three Jail interview room on November 18, 2011 at around 3:00 a.m. and a statement he made to Officer Morse immediately following his arrest at 1:45 p.m. on November 17, 2011

1 should be suppressed.

2 Defendant argues that his statements to Officer Morse should be suppressed because they were involuntary, as they were given after Defendant had been ordered at gunpoint to exit the apartment, handcuffed, forced to lie on the ground and then to sit on the curb, and at all times surrounded by officers with weapons.

Defendant argues that his statements to Morse and DiPiazza should be suppressed because they were involuntary because Defendant was confined in a windowless room in the jail, sleep-deprived at 3:00 a.m., and threatened by Morse and DiPiazza.

### 1. Legal Standard

Even after a *Miranda* waiver, the Government must establish the voluntariness of a confession by a preponderance of the evidence. *United States v. Kelley*, 953 F.2d 562, 564 (9th Cir. 1992) (overruled on other grounds by *United States v. Kim*, 105 F.3d 1579, 1581 (9th Cir. 1997)). A "confession is involuntary only if the police use coercive means to undermine the suspect's ability to exercise his free will." *Pollard v. Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002), *cert. denied* 537 U.S. 981 (2002); *Henry v. Kernan*, 197 F.3d 1021, 1026 (9th Cir. 1999). Impermissible coercive activity can include lengthy questioning, deprivation of food or sleep, physical threats of harm, and psychological persuasion. *Kelley*, 953 F.2d at 565. When a suspect alleges psychological coercion, the relevant question is whether the suspect's will was overborne when he confessed. *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993).

"A court . . . is required to determine, in light of the totality of the circumstances, whether a confession was made freely, voluntarily and without compulsion or inducement of any sort." *Ortiz v. Uribe*, 671 F.3d 863, 869 (9th Cir. 2011) (internal citation and quotation marks omitted). A defendant's "personal characteristics . . . are constitutionally irrelevant absent proof of coercion." *Derrick v. Peterson*, 924 F.2d 813, 818 (9th Cir. 1990) (internal citation and quotation omitted).

### 2. Analysis

With regard to the statements made to Officer Morse at the Highland Complex,

although investigators had their guns drawn when Defendants exited the Highland Apartment, and Defendant was handcuffed, when questioned by Officer Morse, no investigators were pointing weapons at Defendant or threatening him in any way. Officer Morse read Defendant his *Miranda* rights and then asked him a few questions. Although other investigators were milling around the scene and had weapons, there is no suggestion that those investigators were focused on Defendant or were acting in a menacing manner in order to give Defendant the impression that he was being threatened unless he answered questions. Defendant testified that he gave consent to search the car because he knew there was nothing in it and everything happened so fast. Defendant did not testify that he answered questions or gave consent because he was coerced into it by Officer Morse. Simply being handcuffed is not enough to overcome Defendant's will. Accordingly, under the totality of circumstances, Defendant's statements made to Officer Morse at the Highland Apartment were given voluntarily and will not be suppressed.

With regard to the statements made to Officer Morse and Detective DiPiazza at 3:00 a.m., the Court has already found that Officer Morse and Detective DiPiazza did not threaten Defendant. Although Defendant may have been unable to sleep because he was in a holding cell with other individuals, there is no suggestion that investigators prevented him from sleeping or attempted to deprive him of sleep to coerce him into answering their questions. Further, the Court again notes that there is no evidence that Defendant gave any incriminatory statements during the second interview and thus, there is nothing to suppress from such interview. Under the totality of the circumstances, Defendant's statements made to Officer Morse and Detective DiPiazza at the 3:00 a.m. were given voluntarily and will not be suppressed.

### D. CONCLUSION

Based on the foregoing, Defendant's Motion to Suppress Statements (*Miranda* and Voluntariness) (Doc. 99) is denied.

### III. Motion to Suppress Evidence (Firearm and Ammunition) Based Upon Involuntary Consent to Search (Doc. 105)

Defendant also argues that the consent he gave to search the silver Buick at the Highland Complex was given involuntarily and, thus, the evidence obtained from the search of the car (the Glock Model 22 handgun and 16 bullets) should be suppressed.

#### A. Legal Standard

"It is well-established that consent is a recognized exception to the Fourth Amendment's protection against unreasonable searches and seizures. Nonetheless, it is the government's burden to show consent was given 'freely and voluntarily.'" *U.S. v. Russell*, 664 F.3d 1279, 1281-1282 (9th Cir. 2012) (internal citations omitted). There are five factors to be considered in determining the voluntariness of consent to a search:

> (1) whether defendant was in custody; (2) whether the arresting officers have their guns drawn; (3) whether *Miranda* warnings have been given; (4) whether the defendant was told he has a right not to consent; and (5) whether defendant was told a search warrant could be obtained. The fact that some of these factors are not established does not automatically mean that consent was not voluntary.

*Id.* (internal citations omitted).

In this case, Defendant was in custody, the arresting officers did not have their guns drawn when he was asked for consent and only Officer Morse was directly addressing Defendant, Defendant was given his *Miranda* warnings, Defendant was not told that he had a right to consent, and was not told a search warrant could be obtained. Accordingly, the fact that Defendant was in custody and was not told that he had a right not to consent weigh in favor of finding that Defendant's consent was not given freely and voluntarily. On the other hand, the remaining factors favor the Government. There is no suggestion that Defendant was being threatened or implicitly coerced into consenting to the search of the Buick. As noted above, Defendant testified that he gave consent to search the car because he knew there was nothing in it and everything happened so fast. Defendant did not testify that he gave consent because Officer Morse

suggested or behaved in any way that made Defendant believe he did not have a choice.

Based on the foregoing, Defendant's consent to search the Buick was given freely and voluntarily and Defendant's Motion to Suppress Evidence (Firearm and Ammunition) Based Upon Involuntary Consent to Search (Doc. 105) is denied.

### IV. Motion to Suppress Evidence (No Probable Cause for Arrest or Reasonable Suspicion for Stop) (Doc. 121)

Defendant also argues that agents lacked probable cause to arrest Defendant without a warrant. Defendant first argues that he was under arrest when someone ordered him out of the apartment at gunpoint and there was no probable cause for such an arrest. Defendant further argues that, even if he was not under arrest when he exited the Highland Apartment, agents still did not have probable cause to arrest him after he exited. Defendant argues that the agent's actions were inconsistent with a *Terry* stop and, thus, probable cause was required to stop/arrest Defendant. As a result, Defendant seeks suppression of all items found inside the Highland Apartment and the items seized from the silver Buick.

In response, the Government argues that there was reasonable suspicion and/or probable cause to conduct a *Terry* stop of Defendant when he exited the Highland Apartment and, after the protective sweep, the officers had probable cause that defendant was involved with marijuana possession and/or trafficking to lawfully detain and arrest him.

#### A. Legal Standard

Generally, probable cause is required for a warrantless arrest. *Michigan v. Summers*, 452 U.S. 692, 700 (1981).

> Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested . . . Alternatively, this court has defined probable cause as follows: when under the totality of the circumstances known to the arresting officers, a prudent person would have

- 16 -

> concluded that there was a fair probability that [the defendant] had committed a crime.

*United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (internal citations and quotations omitted; brackets in original).

In general, "[a] Terry stop involves no more than a brief stop, interrogation and, under proper circumstances, a brief check for weapons." *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001) (quoting *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir. 1987). A *Terry* stop is permissible under the Fourth Amendment, "if the officer's action is supported by reasonable suspicion to believe criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations omitted).

> [I]n determining whether an officer had reasonable suspicion, due weight must be given, not to his inchoate and unparticularized suspicion, or hunch, but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience[]. Reasonable suspicion is less than probable cause; it is merely a particularized and objective basis for suspecting the person stopped of criminal activity.

*United States v. Crasper*, 472 F.3d 1141, 1147 (9th Cir. 2007) (internal citations and quotations omitted). The Court should consider the totality of the circumstances in deciding whether the officers had a particularized and objective basis for suspecting wrongdoing. *United States v. Terry-Crespo*, 356 F.3d 1170, 1173-74 (9th Cir. 2004).

Further, "an investigative detention does not automatically become an arrest when officers draw their guns . . . use handcuffs . . . or place a suspect in the back of a patrol car." *Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002) (internal citations omitted). "*Terry* accepts the risk that officers may stop innocent people. Indeed, the Fourth Amendment accepts that risk as well. Courts cannot prevent mistakes such as this from taking place; we can only ensure that mistakes are kept to a minimum by requiring officers to act reasonably, for articulable reasons, and not on a hunch." *Id.*

(internal citations and quotations omitted).

It is critical that "the officers diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the suspect." *Id.* at 992 (internal quotations and citations omitted).

### B. Analysis

The Government argues that it had a particularized and objective basis for suspecting Defendant was involved in criminal activity when it detained him after he exited the Highland Apartment. The Court agrees. Prior to the surveillance on November 17, 2011, investigators knew that individuals visiting the Highland Apartment were involved in the possession and distribution of marijuana. On November 17, 2011, investigators observed various individuals entering and exiting the Highland Apartment. Upon stopping the white Ford truck that was parked in the garage of the Highland Apartment, investigators smelled marijuana and observed a large quantity of cash. When the occupants of the Highland Apartment observed the white Ford Truck and the Chrysler being stopped by officers, co-defendant Williams kicked out the window screen and stood in the window as if he were going to jump.

Officer Crescione testified that he ordered Williams back into the Highland Apartment and all five men exited the apartment. Defendant testified that, while he was inside the apartment, he heard investigators outside yelling "come out with your hands up." Defendant is the only person who testified that investigators ordered the five men out of the apartment. Officers Morse and Crescione, and Detective DiPiazza all testified that there were several commands happening at once and each testified that they did not make or specifically hear anyone make such a command to the people inside the apartment. Based on this testimony, the Court finds that the five men exited the apartment voluntarily either because, when Williams was ordered out of the window, they thought they should exit through the front door or because they thought commands being made to suspects in the white truck were directed at them.

Officer Morse testified that, as the men exited the apartment, he noticed that one

of them was carrying a weapon in his waistband and smelled a strong odor of marijuana in the apartment. Under these circumstances, it was reasonable for investigators to conduct a *Terry* stop of Defendant, as, based on the totality of the circumstances, it was reasonable to suspect that Defendant was involved in criminal activity relating to drugs.

It was reasonable for investigators, within the parameters of a *Terry* stop to handcuff Defendant and remove him and the co-defendants from the vicinity of the Highland Apartment while a protective sweep was performed. It was reasonable for investigators to secure the Highland Apartment for their safety and handcuff Defendants to ensure that the Officers' safety was not compromised while the protective sweep was being performed. *See U.S. v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) ("police conducting on-the-scene investigations involving potentially dangerous suspects may take precautionary measures if they are reasonably necessary. The purpose of the Terry frisk is to allow the officer to pursue his investigation without fear of violence.") (internal quotations and citation omitted).

Further, in conducting a protective sweep of the apartment, investigators noted that the apartment contained numerous bales of marijuana and drug packaging supplies. Accordingly, the Court finds that there was probable cause to arrest Defendant after the protective sweep because investigators had reason to conclude that there was a fair probability that Defendant was involved with the activities of the drug trafficking organization.

Based on the foregoing, investigators had reasonable suspicion to conduct a *Terry* stop of Defendant and probable cause to arrest him. Thus, Defendant's Fourth Amendment rights were not violated and Defendant's Motion to Suppress Evidence (No Probable Cause for Arrest or Reasonable Suspicion for Stop) (Doc. 121) is denied.

**V.     CONCLUSION**

Based on the foregoing,

**IT IS ORDERED** that the Motion to Suppress Statements (*Miranda* and Voluntariness) (Doc. 99) is denied.

**IT IS FURTHER ORDERED** that the Motion to Suppress Evidence (Firearm and Ammunition) Based Upon Involuntary Consent to Search (Doc. 105) is denied.

**IT IS FURTHER ORDERED** that the Motion to Suppress Evidence (No Probable Cause for Arrest or Reasonable Suspicion for Stop) (Doc. 121) is denied.

**IT IS FINALLY ORDERED** that the Motion to Sever Defendant (Doc. 129) is denied as moot.

Dated this 28th day of November, 2012.

*/s/ James A. Teilborg*
James A. Teilborg
United States District Judge